Whenever counsel's ready, we're happy to hear from you. Mr. Connell, are you first? Connell, yes, sir. Connell. Thank you. Your Honor, my name is Gene Connell, and I, along with Reese Boyd and Anthony Skordo, represent the felons in this case. And like all great Ponzi schemes, this scheme starts with fraud, criminal activity, and financial crimes. And so it starts in China, and it starts with a guy named Dan Liu who currently lives in the United States, although we're unsure as to why he lives here, under what sense of immigration he does. Mr. Liu established in China a company called Easy Richness. Easy Richness was a peer-to-peer or a classic Ponzi scheme in which Chinese class members invested their money in hopes that they'd get a great rate of return. So Mr. Liu and others, including a lady I'll call Shu Shu Li, developed this Ponzi scheme in which they'd pay through a peer-to-peer lending scheme money to various Chinese individuals, and they would pay them back a high interest rate. And it worked for a while, and if you'll see, the record is voluminous in this case. But the Easy Richness companies are two arms. One is Easy Richness Investment, and one is Easy Richness Real Estate, all controlled by Mr. Liu and Shu Shu Li and others. And you'll see in the record there's marketing materials and all sorts of things that show that. So anyway, as it goes along, Mr. Liu and others from the company somehow get the Chinese government to allow them to move $800 million to the United States to quote, buy property in South Carolina. And those monies, we contend, are owned by these Chinese investors. They take the $800 million and about $200 million is traced to various golf courses in the Myrtle Beach area, about 24 golf courses. And you'll see that information, including closing statements. And so about 2016, everything seems to be going well. Mr. Liu takes a vacation to Europe. The Chinese government finds out that certain people are- Counsel, I don't want to tell you how to do your argument, but we're pretty familiar with the facts. You might want to talk about the law eventually. All right. The facts are we're quite familiar. We've read the briefs. Okay. All right. I will do that. So anyway, as a result of all of what happens, Mr. Liu's in the United States. He's got the money. He says that he's going to give it back. He doesn't give it back. We file a case before the district court. We ask for class certification. Judge Dawson denies class certification for a number of reasons. And we argue that Judge Dawson's decision was wrong. It was an abuse of discretion, and it was clearly erroneous. We did not get a hearing before Judge Dawson, although I understand the law is that he didn't have to give us a hearing. But I think in this case he should have. And so he sets out in an order about, I don't know, four or five pages, along with other issues in the case of motion to compel and some other issues. He sets out that he does not believe that class certification should be granted. And he does not list most of the evidence that we presented to him in the order, and we think that it's erroneous for a couple of reasons. The first thing that he argues about, or he says in the order is, is there's no commonality or typicality. And we argue to the court that there is clearly a commonality and typicality for this reason. The money was invested in golf courses in the United States from China, and it was actually admitted to by Mr. Liu. Mr. Liu, and we have in the record Exhibit 11, which is Mr. Liu saying, hey, I've gone to the United States, and I'm going to give these people their money back, and don't you worry. And so we argue that his admission on videotape to thousands of Chinese investors that he's going to give the money back is clearly commonality, numerosity, typicality, manageability, and all the others because he's admitted to it in his video. Further, Mr. Liu, in his deposition, admits that the money came from somewhere else, and he cites a Mr. Huang who's also in prison as his Xu Xu Li. He also indicates in his deposition that he didn't get all the money from, or he got most of the money from Mr. Huang, who's a confederate who got the money from these Chinese investors. And so we argue to the court that every class member has commonality here because they're all interested in getting their money back from the golf courses that are in South Carolina. So Judge Dawson did not address that issue. He did not also address the issue of – In your view, is commonality under 23A a question of whether everybody's aligned in what they want? I mean, we don't typically think about – what you said is there's commonality because they all want their money back, right? Typically, we don't think about commonality as being like the desired end of the plaintiffs. We think about it as like common issues of law or fact. So I think of commonality in this case as the nexus of the money from China through to the United States. It's all a common fund, if you will. Each person in the class has a common interest in collecting that money. It's one unitary relief. And so we would say to the court that as to the – for instance, as to the constructive trust argument, that everybody who lost money has an interest in trying to recover that money, including Mr. Chang, Mr. Cai, and all the others. So we would say to Your Honor that that's commonality of a form of all the money, if you will. We would also point out their form contracts. We'd also point out, again, that Mr. Liu – Mr. Cai apparently went to see Mr. Liu, and Mr. Liu said, I'm going to get your money back. All of those admissions throughout his testimony and his video, we believe shows a common interest to give the money back to the Chinese investors. So – Does the fraud claim and any statute of limitations arguments indicate that you would have to have an individual analysis with regard to those claims? No, ma'am, I don't think so. I don't think you have to have any individual analysis because, as we say in the brief, we know that there is a database in China about all the individuals who have invested money, and we know that those people who have invested money in the case – You don't have the database, right? We do not. You haven't been able to get it so far? We have not asked for it yet. But you don't have it, and tell me why you think you're going to get it? I know you said in your brief the Chinese government will surely just hand this over. Help me understand why you – what's the basis for that belief? So our basis is, one, the Hague Convention would allow us to get it, we believe. Number two, we think that the Chinese – Do you have evidence that in cases like this where the Chinese government is engaged in a criminal prosecution and efforts at restitution, that they have provided that investigatory material to the United States for use in litigation? Has it ever happened before, to your knowledge? I don't know, to be honest with you, but I do know the database includes all the victims' names, and our expert report, Mr. Cardillo, says in great detail he has taught law in China for a number of years, and another expert named Gao has also said that they believe that this would be easily obtained. And so our burden of proof in the class action, of course, as your Honor knows, is preponderance of the evidence, and, of course, the court is supposed to give a rigorous analysis. And we would argue that based on the facts that we presented, that the preponderance of the evidence with a rigorous analysis would entitle us to class certification based on the commonality, typicality, the Hague Convention, as you've already talked about. Do you agree – I understand you disagree with the conclusion, but do you agree that the challenges that might exist with respect to the Chinese locus of all of these claims and the predominance of Chinese nationals as the plaintiffs, that that is an appropriate consideration under B-3 as part of the manageability or analysis? I don't think that I do agree with that. Tell me why. Yes, sir. Because the money is in South Carolina, the property is in South Carolina, that's where the site of it all is, and it's a simple matter of doing what a receiver did in this case that we cited from the West. Right, but that's to suggest that you think there's other things that outweigh that concern. My question is, is that concern a relevant consideration for the district court? You're saying, well, yes, they're Chinese plaintiffs, but there's this South Carolina property, and so it's accessed here, and so those interests outweigh the others. My question is, do you agree – I think you do, based on your briefing – that the considerations of the difficulties given the extraterritorial issues, that that is a proper consideration under manageability, under a B-3 class? I think I have to agree to that because that's the way it's done. But I would say this to you about that. The manageability part shouldn't allow Mr. Liu, who's wanted by the Chinese police, to get away with $200 million of money which came from China, from Chinese investors who trusted him to give them their life savings. I mean, that to me seems like an overarching problem in the case. So that should trump the rule? I don't know that it trumps the rule, but I think it's something that should be considered. It's a consideration you have to give because the United States should not be a haven for criminal activity. And if this case turns out where the class certification is denied, the plaintiffs are over because most plaintiffs' claims are $10,000 to $14,000, their entire life savings, and you'd have to fly from China to South Carolina to try the case. It's going to cost $10,000 for a ticket. So it seems to me that the manageability has to be considered with a sense of justice, if you will, as to what should happen and should Mr. Liu get away with $200 million. And the plaintiffs don't believe that's the case. But the contracts were entered into in China, were they not? They were. The contracts were entered into in China. Based on your theory of recovery, the criminal acts took place in China, did they not? No, ma'am. The criminal acts took place in South Carolina. How? When the money from China was allowed to go into golf courses in South Carolina. That's how we think it happened. Well, that might have been how the crime was ultimately carried out, but you're saying that the taking was illegal from the inception, aren't you? I'm saying that the taking was illegal from the inception, but I'm saying it was compounded by Mr. Liu's statement on the video that I will get your money back to you, it's in South Carolina, and I've come to get it, and I'll get it back to you, and he didn't do that. And so that's the fraud that goes beyond what happened in China, because now we're all here, we've got all the money, and the Chinese government can't do anything, and no court can do anything about this other than this court. So if we lose, then Mr. Liu wins $200 million that he clearly stole, and the nexus of that is- You made the statement that there's nothing the Chinese government can do about it. Have they sought extradition? We don't have an extradition. With China? Yes, sir. We don't have an extradition. Mr. Liu still remains here in South Carolina collecting money from the 24 golf courses that the money is clearly owed to these people. But we do know that the Chinese government has obtained some sort of redress for a certain number of people, correct? Yes, ma'am. So what happened there was part of the money was invested in China, in office buildings and various other things. And so they seized all that. They seized the offices of the Easy Riches Company. They seized the assets. And so there has been partial payment to some of the- We have no idea which plaintiffs received that remuneration as opposed to which other putative plaintiffs did not. Well- Arguably, you could have some who were fully satisfied, some who received nothing. Arguably. And our subclasses take that into consideration in that we say you cannot collect twice. The Cai, the Ching subclasses both take that into consideration. Thank you. Thank you. Counsel, Mr. Smith, we're happy to hear from you. May it please the Court. Rush Smith. I represent the entity defendants, the limited liability companies. Mr. Lydon, who's in the courtroom with me, represents Mr. Liu. I'll be speaking on behalf of all the police. May it please the Court. The district judge confronted with the complaint that asserted claims for fraud, breach of contract, constructive trust, a variety of things, and presented with the argument that the U.S. District Court for the District of South Carolina should take certification- sell it and distribute the proceeds to people in China who would be identified by the Nanjing People's Court or some other subdivision of the government of China or one of its provinces, the district judge, in that circumstance correctly concluded that this case is just simply not appropriate for class certification. He's well within his discretion on his conclusion about subsection B-2, subsection B-3. That could end the inquiry. The appellants are unhappy that he did not name some things in his order, that he did not specifically call out certain types of evidence, that he didn't reach such issues as the adequacy of the class representatives. The district judge did what judges do every day, what this court does regularly, and that is to reach a ground for decision that is dispositive of the matter before it and stop there and not reach other issues. On subsection B-3, it's hard to imagine an order that is more squarely within the guidance of the Walmart v. Duke's case in which the Supreme Court closed the door to monetary-individualized claims for monetary relief. Judge Dawson used that very language in his order. The plaintiffs have pivoted in their brief from B-3 to mostly addressing B-2, but the judge's order is squarely on point with the Duke's case. Also with Thorn v. Jefferson Life, there the courts dispatched not only the question of whether individualized claims for monetary relief are suitable for B-2 certification, but also the arguments that appellants have made that because the claims sound in equity, they are therefore suitable for B-2 certification. The Supreme Court and this court have just simply shut down that argument, and it is not available under the controlling authorities. Can you talk for a second about B-3? A significant portion of Judge Dawson's order addresses what you might call sort of forum concerns. The district court in South Carolina is not well suited to handle any such claims against Mr. Liu, given the sort of Chinese nexus and locus of most of what was going on here. My question is whether that's appropriate to consider, because none of that deals with the nature of the class. All of those reasons would suggest that even an individual claim would not be manageable in the South Carolina court, and those are like good forum non-convenes arguments. But when I read B-3, I'm a little troubled that B-3 is really focused on the use of a class as opposed to whether this claim, even a stand-alone individual claim, would be unmanageable. Can you help me think through under B-3 how these claim-specific manageability concerns, not class-specific but really claim-specific, are relevant considerations for the district court? I think I can answer that question, Your Honor. For decades, this court's recognized, as stated in Central West vs. W.R. Grace, issues of class action manageability are properly committed to the district court's discretion. Right, so that's totally right, but imagine this scenario where the court says, listen, the class would be easy, but it's the nature of the very claim itself. So I would have the exact same difficulty with an individual claim that I would have with a class claim. And so, yes, if the judge here said, listen, I would have no more difficulty handling a class than I would an individual claim. I know that's not what happened here, but accept my hypothetical for a minute. We might think that that doesn't get to whether the class is manageable, but instead whether the claim is manageable, and it's not obvious to me under B-3 why that consideration is an appropriate one for the court to weigh in the exercise of its discretion. In the judge's order, he mentioned the history of the case. He had considered that as part of his analysis. I think it's really clear he actually used those words. The judge in footnote 10 had found all of that laundry list of things that occurred in China. And the judge faced with class claims, and in particular tracing which individuals in the class invested money, lost money, and did not have their losses fully remunerated by the restitution that the Chinese governments are offering. Totally fair, and those are class-specific issues. I totally get. I acknowledge a hypothetical. It's not this case, but that is part of it. And part of it was, Judge Dawson was talking about the class piece. But what I'm trying to ask about is really the more claim-specific pieces, that getting any type of relief on any of these claims is going to be really difficult, given the Chinese language, given the Chinese government, given not just to figure out who it is, but just any type of claim revolving around an extraterritorial fraud is going to be difficult. And that's not class-specific, it's claim-specific. And it may be that you can consider that. What I'm curious about, though, is why, given the question of other available remedies under B3, it seems to be a remedy-focused question, not a claim-focused question. And yet much of the analysis, you're right, not all of it, but much of the analysis here wasn't about the difficulty with a class remedy, but is instead with the difficulty with the underlying claim. Yes, Your Honor, and I think any time a court is addressing manageability issues, that's part of the court's analysis, that how the case will be proved in that court by whether it's the individual or the class is a fair consideration. And I'm not aware of any authority that's excluded that from the district court's consideration of manageability. Are you aware of authority that's allowed it? I acknowledge I have not found authority that prohibits it, but I haven't found authority that sort of says that it's permissible either. And given the language of B3, it seems it doesn't fit exactly? We've searched high and low also, Your Honor. We've not identified any case where a fraud occurred in China, all the evidence is in China, and the people who will receive the remedy, if any, rendered by the U.S. District Court are in China. We've not identified any cases at all, one way or another, so no, sir, I do not have an answer for a court that's looked to that particular concern. I simply don't. One of the things that appellants argue is that the court should have considered Mr. Cardillo. Now, below we made a motion to exclude Mr. Cardillo. If the court had chosen to put something in his order about Mr. Cardillo's opinion, he might have chosen to put Mr. Cardillo's admission that if the court in South Carolina did what the plaintiffs were asking to do, it would be making history. That when we asked if he was aware of any case in which a court in China had recognized judgment rendered by class action in the United States of America, he was unable to identify any. Also in the record is our expert's report that he has identified no cases in which China has recognized. Why would that matter? So I understand that argument, but why does it matter if Chinese courts would recognize it or not? Their argument is, like, sell the golf courses, send us checks, we'll accept the checks. The only Chinese government issue might be taxation or some other issue there, but it doesn't really require the Chinese government to do anything, does it? Why does the Chinese courts' recognition of it or not matter given that the money that they want is here, right? And there's no suggestion that the Chinese government would prohibit the sending of checks. Yes, sir, that really didn't relate to manageability. That was a point that we briefed below. I don't think it was really in the briefs on appeal. Many courts, when faced with a putative class consisting of foreign nationals, consider, as part of the superiority analysis, whether the foreign country would recognize the finality of the United States' class action judgment. The obvious reason being, if we exhaust the resources of our courts for this relief, will it be final in the place where the relief is going to be delivered? Right, but that seems to make sense in a case where something has to be done by the Chinese courts, right? If they needed to seize assets, right, and do something to collect on the judgment, then the courts' recognition would matter. But where all the money is here, it's hard for me to see why the Chinese courts' recognition, whether manageability or otherwise, why it's relevant. I mean, I don't think it's necessary, but you brought it up, so it just struck me as that seems like an odd consideration to matter in this case. For the manageability argument, it does not. The Chinese court is going to be involved, as was pointed out earlier and with some of the questions from the bench, I believe, that the Chinese authorities have apparently prosecuted the companies and the principals in the companies and has seized the assets and is paying restitution to people. And in fact, the class definitions, each one of them, incorporates that proposition and recognizes that the China courts are acting, have acted and are acting to remedy the wrongs that are at the heart of the complaint in this case. Your colleague brought it up, and I don't recall seeing it from the briefs, and it probably doesn't matter, but on what basis is Mr Liu in the United States? Is that part of the record? Your Honor, he addresses it in his deposition. I apologize that I could not cite what it is. His deposition is at 19-20 and following. That was not part of the briefing below. His legal status has not ever been an issue for the courts. On B-3, in addition to the manageability and the desirability of concentrating, the judge looked at the desirability of concentrating claims in the forum and he considered, among other things, that restitution was being paid there in China. One of the arguments made is that there is an equitable subclass and that that cures certain manageability problems. Your Honor, whatever superficial appeal that argument may have, I think of it as sort of like a black box. They say we've got this black box in which we've put the constructive trust restitution or constructive trust subclass, and that solves all of the manageability problems. But if you open up the box and look at what's inside it, the contents are exactly the same as the other subclasses. Judge Dawson listed in his order the three class definitions. The words are almost exactly the same. The meanings are exactly the same. The classes are the same, and the relief sought for each class is exactly the same. Monies, investments, losses on investments that were not paid back by the Chinese government. There are... The Court's decision on Subsection A regarding statute of limitations was squarely within the Thorne v. Jefferson-Powlett case in which this Court affirmed South Carolina District Judge's opinion, finding that the affirmative defense of statute of limitations raised individual issues that couldn't be proved on a class-wide basis. The... The Court very clearly acted within the guidance of Dukes, within the guidance of Thorne, and with the black letter of B-3, as this Court has interpreted it over the years. I'm happy to address any questions you may have. I'm happy to address some of the arguments that the appellants made. The case, the order seems so sound. The authority seems so clear. I'm loathe to belabor the Court's time. Thank you, Counsel. We appreciate you. Thank you. Happy to hear from you, Counsel. Good morning, Your Honors. My name is Anthony Skordo. I'm here on behalf of the plaintiffs. I'm just... Basically, I think the Court has to look at the order of Judge Dawson. And basically, he abused his discretion in a way because he did not provide a complete review of the record. And in my mind, Your Honor, it's the B-2 argument that was not even addressed, close to being addressed, because this particular rule, this particular scenario, perfectly fits the rule for injunctive relief. Explain, give me at least your version of why this isn't effectively Duke's? Yes, Your Honor, because basically, all the members of the class would obtain relief from this. You would have every single member... The fact that everybody would obtain relief obviously doesn't get you out of Duke's, right? So what about this case is different in your view for why Duke's is not sort of the story here, right? Because B-2, as Duke says, does not authorize class certification when each member would be entitled to an individualized award of damages, right? And what I take Judge Dawson to be saying below is that whether it goes through a constructive trust or not, what you're asking for is an individualized award. Well, that's not correct, Your Honor, because... Which part? That's not what you're asking for or that's not what Duke said? Duke's, basically, what it is is the final injunctive relief or corresponding declaratory relief will... There's an individual nature of the remedy. The remedy only has one nature. It may apply differently to the different members of the class,  So he did not do that analysis whatsoever in his decision. He basically... No, but what I'm asking you is Duke seems to say that if you want an individualized award of damages, of money, right, that it's not a B-2. Doesn't mean you can't do it. You just can't do it under B-2. And so help me understand, just give me your best crack at why you think Duke's doesn't prohibit your B-2 case. I understand you've got B-3 arguments and other issues, but Duke seems to be a significant hurdle for you and I haven't yet heard you articulate and the briefing doesn't seem to articulate why you think you're running this through a constructive trust gets you out of the Duke's rule. Well, I would say, Your Honor, like you said earlier, you spoke about claim-specific and class-specific. An individual has that right to go to South Carolina and has the right to say that his property was fraudulently conveyed without having gotten a judgment or breach of contract and that's in our brief. So that fraudulent conveyance claim is basically an equitable claim and the fact that they don't have a breach of contract is not necessary under South Carolina law.  Your suggestion... I don't understand that statement at all. So your statement is that Duke's turns on whether there's a breach of contract? Say that a different way, if you would, to help me understand it. My understanding of Judge Dawson's opinion is he's saying... I'm asking about Duke's. What I'm asking is why you think Duke's doesn't control and prohibit you from bringing this case as a B-2 class. Because a fraudulent conveyance is different than a claim for money damages and South Carolina allows that without a claim for money damages. If you have property that someone else is holding, you don't have to be asking for money damages. And that was brief and Judge Dawson's opinion basically did not address our argument. He said it was not persuasive that South Carolina law didn't apply but he never said why it was not persuasive. Because we went to the South Carolina law and we said that now there may be some questions as to choice of law. In the one case we cite, they actually certified the case to the South Carolina Supreme Court to see what the choice of law would be. And they're in a very similar situation where stolen goods, proceeds were moved into the state of South Carolina. Because the case settled, they never actually addressed that to South Carolina Supreme Court. So our position is that we're not looking. Now, again, a receiver can determine who won or lost in this scheme. And there's cases out of North Carolina we cite, Bell v. Dissner. There's the Marcos case we cite where property was absconded into another jurisdiction and you're not looking for money damages, you want your property back. So I think that's where the distinction lies. If your honors have any other questions. Thank you, counsel. We'll adjourn court for the day. Come down and greet counsel if you would. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Julius N. Richardson, Barbara Milano Keenan, Elizabeth Kay Dillon